# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RELIANCE INSURANCE COMPANY,**

**Plaintiff,**

**-vs-**                                          **Case No.  6:04-cv-1236-Orl-31JGG**

**SAFEHARBOR EMPLOYER SERVICES I,
INC. f/k/a BNA Group II, Inc. and
PROFESSIONAL STAFFING-A.B.T.S.,
INC.,**

**Defendants.**

_____

## MEMORANDUM OPINION

This is a breach of contract action brought by Reliance Insurance Company (in liquidation) ("Reliance") to collect a retrospective premium on workers' compensation insurance policies issued to Defendants Safeharbor Employer Services I, Inc. ("Safeharbor") and Professional Staffing-A.B.T.S., Inc. ("Professional Staffing").[1]  The case was tried before the Court without a jury on February 1 and 2, 2006.

*The Parties*

Reliance is a Pennsylvania corporation.  On October 3, 2001, Reliance was placed in liquidation by the state of Pennsylvania.  The state's insurance commissioner was charged with the

_____

[1]Although separate policies were issued at the insureds' request, they were treated as a single policy for administrative purposes.

responsibility of winding up Reliance's affairs, including collection of the premiums at issue in this lawsuit.  (Plaintiff's Trial Exhibit 1).[2]

Defendants provide employee leasing and professional staffing services.  From December 1, 1997 through December 1, 1999, the Defendants were covered by workers' compensation insurance policies issued by Reliance which carried a large deductible and were collateralized by two letters of credit totaling nearly $1.4 million.  (Doc. 49 at 4).  Defendants' insurance agent, AON Risk Services ("AON"), proposed that Defendants switch to a retrospective premium policy – one in which the premium is calculated after the policy period – which would eliminate the collateral requirement.  AON also suggested the factors to be used in pricing the new policy form, which Reliance accepted and included in a written proposal.  (DTE 5).  That proposal was accepted and the policies were issued with an effective date of December 1, 1999 through December 1, 2000.  (PTE 2 and 3).

*The Policy*[3]

The policy provided workers' compensation coverage, with a cap of $150,000 per claim. The policy's "Information Page" included an estimated annual premium; however, the actual premium was to be determined after the policy period in accordance with the Retrospective Premium Endorsement.  The formula for calculating the retrospective premium was contained in paragraph C of that endorsement and – simply stated – required addition of three figures: 1.) the

---

[2]The list of Plaintiff's Trial Exhibits (henceforth "PTEs") has been docketed at number 71, while the list of the Defendants' Trial Exhibits ("DTEs") may be found at docket entry 72.  PTE 1 is the October 3, 2001 order of liquidation entered by the Commonwealth Court of Pennsylvania.

[3]Since the policies are identical in their terms, they will generally be referred to in the singular.

basic premium;[4] 2.) converted losses[5]; and 3.) taxes.  The parties agreed that the maximum retrospective premium the Defendants would have to pay would be $2,700,000.

In the policy, Reliance agreed that it would calculate the retrospective premium "using all loss information we have as of a date six months after the rating plan period ends and annually thereafter" and also agreed to have these calculations verified "by the appropriate rate service organization at your request."  (PTE 2 and 3, Retrospective Premium Endorsement at ¶ D1).  The Defendants agreed that, after each calculation of the retrospective premium, they would "promptly pay the amount due [Reliance]."  (PTE 2 and 3 Retrospective Premium Endorsement at ¶ D3).

*The Dispute*

The policy year for the policies at issue in this case ended on December 1, 2000.  During the course of that policy year, various claims were made, which were adjusted by a third party, Crawford & Company ("Crawford").[6]  Crawford submitted monthly loss runs to Defendants concerning these claims.  Defendants and Crawford had frequent communication concerning these claims and Defendants were satisfied with Crawford's claims handling.

The first retrospective adjustment calculations, which were performed on December 4, 2001, were valued as of May 31, 2001, prior to the liquidation order.  (PTE 13).  Those

---

[4]The basic premium was a set amount intended to compensate Reliance for its overhead and provide its profit.

[5]"Converted losses" included both the amount already paid on workers compensation claims and the amount expected to be paid in the future on those claims, subject to a per-claim limitation of $150,000 and multiplied by a "loss conversion factor."

[6]Crawford had been the third-party administrator (claims adjuster) under the prior years' policies.  The proposal which preceded the issuance of the policies at issue in this case contemplated the continued use of Crawford & Company to adjust claims (DTE 5 at page 12).

calculations showed converted losses of $1,401,711 and an indicated retrospective premium of $2,103,708.[7]  Subtracting the pre-paid premium of $1,795,728[8] left a retrospective premium due of $307,980.  A $400 adjustment on Line 28 of the calculations (for an "audited non-subject premium") resulted in a grand total due of $308,380.  Although Defendants did not complain about this calculation or the data underlying it, they did not pay the amount Reliance claimed was due.

When Reliance went into liquidation in the fall of 2001, the claims were assigned to individual state guaranty associations.  The Florida association chose United Self Insurance Services ("USIS") as the claims adjuster for these files.  Crawford therefore transferred all of its files to USIS, which processed all remaining claims.  Initially, the administration of these claims was described by Reliance as chaotic, because USIS was overwhelmed in trying to process all of Reliance's claims.  Overall, Defendants complain that USIS provided services inferior to those provided by Crawford.[9]

---

[7]Calculated using the sum of the basic premium ($675,000) and converted losses ($1,401,711), plus taxes.

[8]Subsequent premium calculations reflect a slightly lower figure for the pre-payment.  The discrepancy between those pre-payment amounts and the amount shown on this first set of calculations was never explained at trial.  In reaching its ultimate conclusion, the Court will use the lower number – $1,792,599 – reflected on the final premium calculations. (PTE 6).  Defendants do not object to this pre-payment figure, so presumably it is the correct one.

[9]Defendants contend that the proposal which "contemplated" the use of Crawford as the third-party administrator (DTE 5 at page 12) was a condition of the contract itself, which Plaintiff breached when it changed its claims-handling procedures post-liquidation. The Court rejected this contention as contrary to the parole evidence rule. *See, e.g., Fireman's Fund v. Tropical Shipping*, 254 F.3d 987, 1003 (11th Cir. 2001) (in the absence of ambiguous language, a court may not look to parole evidence in construing an insurance contract).

The second retrospective adjustment calculations, with a valuation date of September 30, 2001, were performed on July 31, 2002.  (PTE 12).  These calculations showed that converted losses had increased to $1,735,911 with a retrospective premium due in the amount of $646,525.[10] (PTE 12).  The third set of adjustment calculations, valued as of March 31, 2003, reflected converted losses of $2.5 million, resulting in a retrospective premium of $3,249,978, substantially in excess of (and therefore reduced to) the policy maximum of $2.7 million.  (DTE 47).  The fourth and final calculation, made April 15, 2004 with a valuation date of March 31, 2004, reflected converted losses of $2,638,154.  (PTE 6).  Since the resulting retrospective premium ($3,356,225) was now well in excess of the maximum allowed under the policy, Plaintiff discontinued its calculation adjustments.  The Plaintiff now seeks payment of $907,801,[11] representing the difference between the agreed maximum premium ($2,700,000) and the amount prepaid by the Defendants, ($1,792,599), plus the $400 audited non-subject premium.

During the period when these calculations were being made – December 4, 2001 through April 15, 2004 – Defendants made no premium payments to Reliance.  Nor did Defendants make any genuine effort to question the retrospective premium calculations or the underlying data.

---

[10]Because this second adjustment was valued before Reliance's liquidation, all the loss information used for these calculations was also provided by Crawford, and thus presumed by Defendants to be correct.  In addition, as was the case with the initial calculations, the total claimed due by Reliance included $400 for an audited non-subject premium, resulting in a grand total due of $646,925.  (PTE 12).

[11]More specifically, the Plaintiff seeks to recover an unpaid retrospective premium of $758,226 from Safeharbor and $149,575 from Professional Staffing.  (Doc. 49 at 9).

Rather, it appears that Defendants were more concerned about the return of their $1.3 million letter of credit, which they had posted as collateral for the prior year's policies.[12]

Because Defendants do not question the retrospective premium calculation itself, the crux of their defense is the assertion that the underlying data is flawed. To this end, Plaintiff introduced the April 15, 2004 loss runs for these two policies (PTE 4 and 5), upon which the retrospective premium calculation was based. These documents were created by Reliance in the ordinary course of its business, using the claims data obtained from the claims adjusters. They reflect a summary of each claim made during the policy year, its status (open or closed), the reserve established and amounts paid.

Because Reliance did not administer the claims, the loss information necessary for the loss runs was provided to Reliance by Crawford or the state guarantee associations. Tr. at 21. Before the loss information was entered into Reliance's computer, Reliance's "Corporate Systems Department" or "Data Integrity Department" reviewed it, comparing it to the previous loss information to insure the integrity and accuracy of the information. Tr. at 21-22, 33, 93-94. Reliance also conducted random audits of its claims adjusters and the state guaranty associations to insure the accuracy of the information being provided. Tr. at 33, 93-94.

In addition to checking the data underlying the retrospective premium calculations, Reliance had an internal "check and balance" system designed to insure that the calculations themselves were accurate. For example, after a retrospective calculation was done, a manager

---

[12]Throughout this trial, Defendants attempted to link the return of this collateral to the issues in this case. However, since this collateral relates to separate policies that are not before this Court, that evidence was ruled irrelevant.

would review it, the accounting department would review it, and in some cases (including this one), the underwriter for Defendants' policies would review the factors and the calculation to insure their accuracy before the calculation was sent to Defendants.  Tr. at 30, 59, 122.[13]

At trial, Defendants offered only anecdotal evidence that some of the data underlying Reliance's premium calculations might have been inaccurate.  Defendants' in-house counsel and corporate representative questioned some of the data based on his recollection of several claims. He testified, for example, that a few "open" claims should have been closed.  In one instance, this would have had the effect of reducing a particular converted loss by $105,000.[14]  However, even if **all** of the open reserves were eliminated, the retrospective premium calculation would still have exceeded the $2.7 million maximum premium.[15]

As to other payments, Defendants simply questioned their accuracy.  No proof was offered that any claim amount reflected in the loss runs was in fact erroneous.[16]  Presumably, the Defendants could have investigated any claims about which they had questions by way of a third party document subpoena to Crawford or USIS.  Defendants do not explain why they did not attempt to obtain the information needed to support these contentions.

---

[13]At trial, the Court was satisfied that these documents were admissible under the business records exception to the hearsay rule, Fed. R Evid. 803(6).

[14]See PTE 5 and Defendants' Ex. 49 regarding Kathi Wekwert.

[15]Testimony of Jack O'Connell at Tr. 121-122.

[16]Defendants provide only two examples of inaccurate loss payment amounts: Claimant Giaimo with a discrepancy of $9,000 and Claimant Burbage with a discrepancy of $2,000. Tr. at 244-245, 249.  Such a discrepancy, if true, is deminimus.

*Legal Analysis*

Plaintiff asserts two claims against each Defendant – one for breach of contract and one for unjust enrichment.

A.     Breach of Contract[17]

Defendants do not dispute the existence of an enforceable insurance contract.  And Defendants concede that they made no retrospective premium payments to Plaintiff.  Thus, if any retrospective premiums were due and owing, Defendants have breached the contract and are liable for the premium due.

Apart from various evidentiary objections (which the Court has overruled), Defendants' primary post-trial contention is that Reliance has no standing to seek payment for premiums based on claims paid by the guaranty associations after Reliance went into liquidation on October 3, 2001.  (Doc. 75 at 7-9).  However, the Court concludes that the Defendants waived any right they might have had to raise this issue at trial.  In paragraph 23 of their answer, the Defendants state that they have not made payments as demanded by Reliance "because Defendant denies that money is owed to Reliance as set forth in its affirmative defenses."  (Doc. 6 at 2).  Yet nowhere in their affirmative defenses (Doc. 6 at 3-4) do Defendants allege that the Plaintiff lacks standing. Nor was this issue disclosed by Defendants in the Joint Final Pretrial Statement (Doc. 49).[18]  In addition, in paragraph 2 of its Complaint (Doc. 2), Reliance asserted its standing in accordance

---

[17]The breach of contract claims are asserted in Counts I and II of the Complaint (Doc. 2).

[18]Local Rule 3.06(e) provides that all pleadings filed prior to the filing of the final pretrial statement shall be merged into that statement, which will control the course of the trial and may not be amended except by order of the court.  Although Defendants made passing reference to the standing issue in their trial brief (Doc. 50), no effort was made to amend the pretrial statement in this regard.

with the order of liquidation to seek the relief requested.  The Defendants admitted paragraph 2 of the Complaint.  (Doc. 6 at 1).

The Court concludes, therefore, that Defendants have breached the contract of insurance by failing to pay the retrospective premium of $907,801.

B.      Unjust Enrichment

Because Plaintiff is entitled to a remedy at law for liquidated damages (the unpaid insurance premium), its equitable claim is inappropriate.  *See*, *e.g.*, *Williams v. Bear Stearns & Co.*, 725 So.2d 397, 400 (Fla. 5th DCA 1998) ("upon a showing that an express contract exists . . . the unjust enrichment or promissory estoppel count fails.").  Accordingly, Counts III and IV of the Complaint will be dismissed.

*Conclusion*

Judgment will be entered for Plaintiff and against Defendant Safeharbor Employer Services, I, Inc. in the amount of $758,226.  Judgment will be entered for Plaintiff and against Defendant Professional Staffing-A.B.T.S., Inc., in the amount of $149,575.  The final judgment will include prejudgment interest.  Counsel for Plaintiff shall, within 20 days, file a computation of prejudgment interest along with a statement as to whether Defendants concur as to the amount.  If they do not, Defendants may file objections to the calculations within 10 days thereafter.  The Court also reserves jurisdiction to enter an award of costs pursuant to 28 U.S.C., section 1920.

If Plaintiff claims an entitlement to attorney's fees, it shall submit its application therefore, with supporting documentation, within 30 days of the date of this order.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 24, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-10-